IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | | |
|---|---|---|
| DEBRA ABORN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 06-6142-CV-SJ-REL-SSA |
| MICHAEL ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Debra Aborn seeks review of the final decision of
the Commissioner of Social Security denying plaintiff's
application for disability benefits under Title II of the Social
Security Act ("the Act"). Plaintiff argues that the ALJ erred in
finding plaintiff not credible, and that the hypothetical relied
on by the ALJ did not incorporate all of plaintiff's limitations.
I find that the substantial evidence in the record as a whole
supports the ALJ's finding that plaintiff is not disabled.
Therefore, plaintiff's motion for summary judgment will be denied
and the decision of the Commissioner will be affirmed.

### I.   BACKGROUND

On August 28, 2003, plaintiff applied for a period of
disability and disability insurance benefits alleging that she
had been disabled since January 20, 1999. Plaintiff's disability
stems from arthritis and heart problems (Tr. at 133).
Plaintiff's application was denied on December 5, 2003. On

September 26, 2005, a hearing was held before Administrative Law
Judge James Stubb.  On January 27, 2006, the ALJ found that
plaintiff was not under a "disability" as defined in the Act.  On
March 29, 2006, the Appeals Council denied plaintiff's request
for review.  Therefore, the decision of the ALJ stands as the
final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for
judicial review of a "final decision" of the Commissioner.  The
standard for judicial review by the federal district court is
whether the decision of the Commissioner was supported by
substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales,
402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847,
850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th
Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir.
1996).  The determination of whether the Commissioner's decision
is supported by substantial evidence requires review of the
entire record, considering the evidence in support of and in
opposition to the Commissioner's decision.  Universal Camera
Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876
F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into
consideration the weight of the evidence in the record and apply
a balancing test to evidence which is contradictory."  Wilcutts
v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v.

2

<u>Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." <u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

3

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

4

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Denise Waddell, in addition to documentary evidence admitted at the hearing and before the Appeals Council.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1974 through 2005:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1974 | $ 550.37 | 1990 | $ 0.00 |
| 1975 | 241.84 | 1991 | 0.00 |
| 1976 | 50.46 | 1992 | 3,284.38 |
| 1977 | 2,082.95 | 1993 | 6,949.01 |
| 1978 | 159.01 | 1994 | 6,305.35 |
| 1979 | 732.65 | 1995 | 4,394.38 |
| 1980 | 846.46 | 1996 | 5,197.51 |
| 1981 | 760.92 | 1997 | 6,112.49 |
| 1982 | 158.90 | 1998 | 8,284.85 |
| 1983 | 288.77 | 1999 | 6,664.98 |
| 1984 | 0.00 | 2000 | 8,629.27 |
| 1985 | 626.30 | 2001 | 2,659.76 |
| 1986 | 0.00 | 2002 | 1,825.00 |
| 1987 | 1,301.31 | 2003 | 4,378.28 |
| 1988 | 279.15 | 2004 | 0.00 |
| 1989 | 1,486.51 | 2005 | 0.00 |

5

(Tr. at 95, 96).

**Disability Form**

Plaintiff, assisted by her mother, completed a form on
September 7, 2003 (Tr. at 133-138). In that form, plaintiff
alleged that she cannot work due to arthritis and heart problems
(Tr. at 133). She reported she has no side effects from any
medication, she uses no ambulatory aids, she is able to pay
bills, use a checkbook, complete a money order, count change, do
her banking, and go to the post office (Tr. at 134-135). She is
unable to do laundry, do dishes, make her bed, iron, vacuum,
sweep, or take out the trash (Tr. at 135). She reported that she
is able to shop for about 30 minutes (Tr. at 136). She is able
to sew, and she is able to watch a two-hour movie on television
but has to get up periodically (Tr. at 136). She reads
newspapers, and she has no trouble with reading (Tr. at 137).
She has a valid driver's license, but had not driven for a few
months although no one had advised her not to drive (Tr. at 137).
She has no difficulties following written or verbal instructions
(Tr. at 137).

**Claimant Questionnaire Supplement**

In a Claimant Questionnaire Supplement completed on
September 7, 2003, plaintiff reported that she does no exercise,
that she can sit for two hours at a time, that she can stand "not
very long", that she can walk for 30 minutes at a time, that she

6

can lift nothing, and that she can reach forward or backward for about ten minutes (Tr. at 139). When asked to describe her pain, plaintiff described pain in her chest, hips, knees, and right shoulder (Tr. at 139).

## B.    *SUMMARY OF MEDICAL RECORDS*

On February 24, 1998, plaintiff had an echocardiogram due to complaints of chest pain (Tr. at 233). Francisco Lammoglia, M.D., a cardiovascular physician, concluded that the echocardiogram was normal.

January 20, 1999, is plaintiff's alleged onset date of disability, although there are no medical records for nearly a year before that date or a year after.

On November 5, 1999, plaintiff saw Debra Pankau, a family nurse practitioner (Tr. at 166). Plaintiff had seen Dr. Humphrey who put her on Meridia[1], 15 mg. That was causing some tachycardia so he decreased her to 10 mg and she was doing well. She was not exercising, although "We have encouraged her to do so." Plaintiff's weight was 229 pounds.

On February 3, 2000, plaintiff saw Debra Pankau (Tr. at 165). She reported that she twisted her ankle going down the stairs (Tr. at 165). Plaintiff had full range of motion in her ankle. She had mild swelling. Her knee was fine. Plaintiff's

---

[1]Used as a supplement to diet and exercise to aid in weight loss.

7

x-rays showed no abnormality related to trauma of the ankle or foot, according to Stephen Blatt, M.D. (Tr. at 168). Plaintiff was assessed with ankle sprain and was put in a splint. She was told not to bear weight on her ankle for three days. She was told not to work until Monday, or February 7 (four days later). Plaintiff was told to take Motrin for pain and swelling.

On May 4, 2000, plaintiff saw Debra Pankau (Tr. at 164). Plaintiff said she had been on Meridia for weight loss, but was currently off of it due to the cost. She wanted to restart it. Plaintiff's weight was 233 pounds. Ms. Pankau said she would check with Dr. Humphrey to see if he would refill plaintiff's Meridia.

On June 6, 2000, plaintiff saw Debra Pankau for a follow up on weight loss (Tr. at 163). Dr. Humphrey had seen her for this and put her on Meridia. Plaintiff reported she was feeling fine and had no problems. She was "not really adhering to her diet as well as she would like". Plaintiff was told to stick to a 1,500 calorie diet.

On July 20, 2000, plaintiff had x-rays of her right shoulder due to shoulder pain (Tr. at 231). "The acromioclavicular joint and CC joint spaces appear stable. . . . No evidence of acute fracture, subluxation or significant degenerative change in the right shoulder."

8

On October 27, 2000, plaintiff saw Debra Pankau (Tr. at
162).  Plaintiff wanted to follow up on weight loss.  She had
been off Meridia since July.  Plaintiff's weight was 231.5
pounds.  Ms. Pankau noted that plaintiff's highest weight in the
last year was 239 pounds.  Plaintiff was assessed with obesity.
Ms. Pankau indicated she would consult with Dr. Humphrey to see
if he would place her back on Meridia.  "Have encouraged a low
fat diet and aerobic exercise 20 minutes 3 times a week.  We have
gone over these with her before."

On April 30, 2001, plaintiff saw Debra Pankau (Tr. at 160-
161).  Plaintiff reported nausea and vomiting but no other
symptoms.  She weighed 240.5 pounds.  Plaintiff reported that she
smokes 1/2 pack of cigarettes per day and has for the past 17
years.  Plaintiff was assessed with nausea and vomiting.  She was
giving Compazine suppositories for nausea and told to advance to
a BRAT diet as tolerated.

On July 2, 2001, plaintiff saw Debra Pankau (Tr. at 157-
159).  Plaintiff weighed 228 pounds.  She complained of a
headache, and said that she passed out the evening before and hit
her head after she had had a fight with her husband.  She said it
had been 110° at work that day in the café, and that she had been
working 11-hour days.  She had been very hot at work and had
stopped sweating.  She was diagnosed with "syncope (?)" and heat
exhaustion.  Plaintiff had a lipid panel done, which was

9

essentially normal.  The lab report has the following handwritten notation: "Need to exercise walk some 3x week to increase good cholesterol and decrease bad, recheck 3-6 mos".

On October 18, 2001, plaintiff saw Debra Pankau (Tr. at 153).  She reported that she fell three days ago and twisted her right hip.  She was having hip pain mostly at night.  She weighed 213.5 pounds.  She had full range of motion in her hip, her pain was really in the right gluteus maximus area, not in her joint. Plaintiff said she would come back in the morning for an x-ray.

Plaintiff did not see a medical professional for any impairment related complaint during the next seven months.

On May 23, 2002, plaintiff saw Debra Pankau (Tr. at 152). Plaintiff complained of burning in her hip.  "We have talked to her about this in October.  Wanted her to do some x-rays.  She has been putting that off but it has been getting worse.  She will take an occasional Motrin. She is here today for us to get that hip x-ray."  Plaintiff also complained of depression because she thought her husband may be having an affair.  "She feels like she is sleeping more at night. . . .  Other than the increased hip pain, no other pain or problems."  Plaintiff's hip x-ray was normal according to Scott Rossow, D.O. (Tr. at 154).  Ms. Pankau assessed right hip pain.  "Looks like a little bit of mild OA [osteoarthritis] on my read."  Plaintiff was prescribed Voltaren, a non-steroidal anti-inflammatory.

Case 5:06-cv-06142-REL   Document 11   Filed 08/31/07   Page 10 of 50

Plaintiff did not see a medical professional for her disability-related impairments for the next 14 months.

On July 14, 2003, plaintiff went to the emergency room complaining of abdominal pain, worse with meals (Tr. at 212-213). Plaintiff reported that she does not smoke, drink, or use drugs. She was not taking any medications. Plaintiff was given pain medication and instructed to get an outpatient ultrasound (Tr. at 213).

On July 15, 2003, plaintiff was seen by Edward Andres, III, M.D. (Tr. at 205-206). She reported experiencing vague abdominal pain over the past several days. She went to the emergency room and had an ultrasound of her right upper abdominal quadrant which revealed a large mobile gallstone within the gallbladder (Tr. at 203). Plaintiff's pain continued to get worse in the emergency room. "She has otherwise been in good health. She smokes a pack of cigarettes daily. She is a homemaker." Plaintiff was assessed with symptomatic cholelithiasis (gallstones), and she had her gallbladder removed that same day (Tr. at 206-208).

On July 27, 2003, plaintiff went to the emergency room complaining of near syncope [near fainting] and weakness (Tr. a 192-194). Plaintiff said she was preparing to fix lunch and she felt like her heart was doing cartwheels. She became very weak and diaphoretic [sweating profusely], said everything became black and it was like everything was at a distance. Plaintiff

11

had no chest pain.  Her symptoms lasted a few minutes and then dissipated spontaneously except she remained weak.  Plaintiff reported that she had "no difficulty with activities of daily living".  She was a smoker.  The only medication she was on was Lortab[2] due to recent surgery.  Plaintiff had no unusual cardiac activity on the monitor in the emergency department, but she was bradycardic[3].  Plaintiff was admitted to the hospital under the care of Dr. Susan Vega.

On July 28, 2003, plaintiff was seen by Francisco Lammoglia, M.D., a cardiovascular physician, at Heartland Hospital (Tr. at 189-190).  "This is a 45-year-old female patient, status post laparoscopic cholecystectomy [removal of the gall bladder] on July 16, 2003, who was brought into the emergency room by ambulance for syncope.  The patient says that she had been doing quite well, doing some work on Saturday, and some on Sunday, so she had taken a Lortab.  She developed some incisional discomfort when at work and went to bed.  The patient states she got up later and she became quite trembly.  She felt her heart was doing 'cartwheels' and felt palpitations.  She felt lightheaded, cold, clammy, and her husband said that she looked quite pale.  The

---

[2]Acetaminophen (Tylenol) and Hydrocodone (a narcotic analgesic).

[3]Bradycardia is defined as a resting heart rate of under 60 beats per minute, though it is seldom symptomatic until the rate drops below 50 beats per minute.

Case 5:06-cv-06142-REL   Document 11   Filed 08/31/07   Page 12 of 50

patient does have a history of palpitations in the past, but has never had any syncope. She did not have any syncope with this episode. No chest tightness, tenderness, or fullness, PND, orthopnea." Plaintiff reported she was smoking about a pack of cigarettes per day, does not exercise regularly or follow any particular diet. Dr. Lammoglia's impression was "Syncope or near syncope with some palpitations. The patient is without any evidence now of abnormalities, but will need to obtain evidence that she did not have some sort of arrhythmia. Will check thyroid studies anyway, 24-hour Holter, 2D echo doppler, rule out structural abnormalities. We may need t-wave alternans or even perfusion scan to rule out ischemia as an outpatient. No other cause can be found." Plaintiff had reported that she suffers from Degenerative Joint Disease, and Dr. Lammoglia assessed "Degenerative Joint Disease. Quite stable and will change from the Lortab for pain to nonsteroidal [anti-inflammatory] to see whether that is less likely to provide any kind of problems with this individual."

On July 29, 2003, Dr. Vega noted that plaintiff said on the day of her admission to the hospital, she woke up at 6:30 a.m., took a Lortab, and went back to bed (Tr. at 194-195). She got up around noon, and about 55 minutes later developed a presyncopal episode. Plaintiff had had her gallbladder out on July 16, 2003, and was on Lortab for that. "She does state that she had a

13

similar episode approximately 3 years ago and was evaluated at that time, and apparently she had an echocardiogram that was normal in 1998, read by Francisco J. Lammoglia, M.D.  Her blood pressures have been within normal limits here."  Plaintiff reported smoking at least one pack of cigarettes daily.  Dr. Vega assessed near-syncopal episode, status post gallbladder surgery, and positive smoker.

On July 31, 2003, Francisco Lammoglia, M.D., performed an echocardiogram which was essentially normal (Tr. at 188, 265).

On August 7, 2003, Francisco Lammoglia, M.D., a cardiovascular physician, assessed plaintiff's Holter monitor results (Tr. at 186).  She had worn the monitor for 22 hours and 59 minutes.  Her heart rate ranged from 51 beats per minute to 117 beats per minute with an average rate of 64 beats per minute. The impression was:

1.    Underlying rhythm sinus mechanism.

2.    No significant ventricular or supraventricular tachy arrhythmia.

3.    No conduction blocks or pauses.

On September 4, 2003, plaintiff was seen by Francisco Lammoglia, M.D., a cardiovascular physician, due to episodes of atypical syncope (Tr. at 182-183). "The patient had several episodes, but we have not been able to capture any of those readings on event monitoring.  She had another episodes [sic] where she became somewhat presyncopal, but she was sitting down

14

when that occurred. She said her heart was going 135 beats per minute, but the event monitor did not record anything to that event. She is not having any chest tightness, heaviness or fullness otherwise." Plaintiff's weight was 206 pounds. Her cardiac exam was normal. Dr. Lammoglia assessed syncope, etiology uncertain. "I do not know whether we are dealing with a cardiac event or a non-cardiac event. Therefore, since we are not being able to capture the monitor properly and the visits that she has had to the Emergency Room everything has panned out to be normal, I am going to put an event monitor in her."

On September 17, 2003, Francisco Lammoglia, M.D., inserted a Reveal implant into plaintiff's pectoralis muscle (Tr. at 178).

On September 26, 2003, S. R. Davuluri, M.D., a neurologist, wrote a letter to Francisco Lammoglia, M.D. (Tr. at 171-172).

Debbie . . . had a cholecystecomy [removal of the gallbladder] in July and two weeks later she started having diaphoresis [excessive sweating] and a cold and clammy feeling. She gets dizziness and near syncopal [near fainting] events. She has had headaches for two years or so twice a week. The headaches are located in the vertex throbbing in quality with nausea. She has dysarthria[4]. . . . She has chest pain and shortness of breath. She currently has King of Hearts monitor in place.

MEDICATIONS: None

EXAMINATION: . . . Weight was 209 pounds.

_____

[4]Dysarthria is a motor speech disorder. The muscles of the mouth, face, and respiratory system may become weak, move slowly, or not move at all after a stroke or other brain injury. The type and severity of dysarthria depend on which area of the nervous system is affected.

15

NEUROLOGICAL EXAMINATION: . . .  The patient is oriented x
3. . . .  Gait and station are within normal range.

IMPRESSION: Ms. Aborn presents with a history of near
syncopal events and her examination reveals no abnormality.
She possibly may have postural hypotension.  I will start on
her Florinet .1 mg a day and once the monitor comes off one
could consider imaging procedures such as MRI of the brain.

(Tr. at 171-172).

On October 24, 2003, plaintiff saw Debra Pankau (Tr. at

282).  Plaintiff complained of increased blood sugar at times,

dizziness, lightheaded when eating stew.  Plaintiff weighed 212.5

pounds.  She reported no muscle symptoms.  She was assessed with

dizziness, and Ms. Pankau ordered an A1C test, used primarily to

monitor the glucose control of diabetics over time.

On October 25, 2003, plaintiff had blood work done (Tr. at

283-284).  Her glucose was 83 (normal), and her A1C was 5.1

(normal).

On November 18, 2003, plaintiff saw Francisco Lammoglia,

M.D., a cardiovascular physician, due to palpitations (Tr. at

176-177).  "She underwent implantation of a REVEAL device.  The

patient had an episode, which was quite significant, but she

forgot her activator and did not activate the REVEAL device

during that episode.  The machine though did not auto-activate

any episodes concomitantly, although it already had had five

auto-activated events on the recording.  The patient states that

she did active [sic] previously a couple of episodes, which were

just minor ones and did not have any of the significant symptoms

16

that she had previously. She is without orthopnea or PND, syncope or near syncope otherwise." Plaintiff weighed 212 pounds. Her cardiac exam was normal. Dr. Lammoglia assessed palpitations and near syncope. "We will not make any changes. We will wait until an episode occurs". He noted that plaintiff's implantation was good for one to one and a half years.

On December 28, 2003, plaintiff went to the emergency room for dizziness and a headache (Tr. at 266-267). She reported that she had had a sensation of things spinning about her, and since that morning she had had a global headache which had gradually worsened. She had a CT scan of her head which was normal (Tr. at 268). William Gummelt, M.D., assessed vertigo and a headache. She was given Valium and Lortab which caused marked improvement in her symptoms. She was prescribed Antivert for vertigo, and Lortab (12 tablets) for pain. "Avoid dangerous activities such as driving until well."

On January 6, 2004, plaintiff saw Debra Pankau, complaining of head congestion and a cough (Tr. at 281). Plaintiff weighed 227 pounds.

On January 29, 2004, plaintiff saw Debra Pankau (Tr. at 280). She complained that she fell at home and injured her left wrist. Plaintiff weighed 227 pounds. She had x-rays done of her wrist, and no fractures were seen (Tr. at 271). She was given a splint.

17

On November 15, 2004, Dr. Lammoglia removed the implantable loop recorder (Tr. at 253). Prior to the removal, plaintiff had an exam. Her cardiac exam was normal. "The patient has not had any significant palpitations. No significant chest tightness, orthopnea, or other symptamotology." She also had x-rays of the chest which were normal (Tr. at 264).

On January 20, 2005, plaintiff saw Francisco Lammoglia, M.D., a cardiovascular physician (Tr. at 251-252). She complained of a history of weakness and palpitations in the past, "which did not show any evidence on event monitoring as being cardiac in origin. She is having some chest discomfort, which is retrosternal and quite significant and the next day felt tired and rundown. This has happened several times. She used to smoke and she is off cigarettes now for over a year and doing fairly well from that standpoint. No syncope or near syncope noted." Plaintiff's cardiac exam was normal. Dr. Lammoglia's impression was "Chest pains, atypical in nature. I suspect that they are not cardiac", but in order to eliminate causes for the episode, Dr. Lammoglia recommended a perfusion scan.

On January 25, 2005, plaintiff had a perfusion scan (Tr. at 250). Under recommendations, "medical treatment" is checked. The handwritten notes at the bottom of the report indicate that the doctor attempted to call plaintiff on January 31, 2005, but

18

there was no answer; he tried to call again at 9:15 a.m. on February 1, 2005, but there was no answer.

On February 5, 2005, plaintiff went to the emergency room and saw Lynthia Andrews, D.O., due to pain in her sinus area (Tr. at 261-262). She denied dizziness. "The patient states she is on no medications. . . . She is on disability for her heart. The patient states that she no longer smokes cigarettes. She stopped one and one-half years ago." Plaintiff was assessed with acute sinusitis.

On February 8, 2005, plaintiff saw Debra Pankau (Tr. at 279). Plaintiff's weight was 250 pounds. She noted that "some smells make her dizzy", that she continues to have episodes of weakness, and she was not sleeping well. Ms. Pankau assessed chest pain, weakness, and anxiety. She gave plaintiff samples of Lexapro.

On April 5, 2005, plaintiff saw Debra Pankau for a recheck on her medication (Tr. at 276). Plaintiff's weight was 248 pounds. Plaintiff had "no muscle symptoms today". She reported she "does not feel depressed". There is no assessment or plan listed. She did note that plaintiff had tried the Lexapro and her husband thought it made her anxious.

On May 12, 2005, plaintiff saw Debra Pankau due to ankle and feet edema and a rash (Tr. at 277). She said she had been out in the heat, drank lots of water, and she was "on her feet a lot".

Plaintiff weighed 265 pounds.  She was assessed with extremity edema.

That same day, Ms. Pankau completed a medical source statement physical/mental at the request of plaintiff's attorney (Tr. at 244-248).  When asked to describe the treatment provided, Ms. Pankau wrote, "Has seen other providers for majority of problems."  When asked to describe plaintiff's response to treatment, Ms. Pankau wrote, "Patient really has only recently followed up for 'weakness' – has seen other providers – follow up is sporadic."  When asked whether plaintiff had lifting or carrying limitations, Ms. Pankau checked "yes" and wrote "Patient states can not lift or carry RIT[5] weakness episodes."  When asked whether plaintiff's sitting, standing or walking are affected by her impairment, Ms. Pankau checked "yes" and wrote "Patient reports symptoms feels very faint/weak."  Ms. Pankau did not indicate to what extent plaintiff's ability to sit, stand, or walk were limited.  When asked to describe any limitations in plaintiff's ability to use her hands or feet, any postural limitations, or manipulative limitations, Ms. Pankau failed to complete any of those sections and instead wrote, "These are hard to determine.  Patient needs to be evaluated by a [illegible] and a diagnosis needs to be established before we can assign what [illegible] she can complete."  The environmental restrictions

_____

[5]I have been unable to determine what RIT means.

20

section was left blanket, and the entire mental assessment was left blank.

On May 24, 2005, plaintiff had an MRI of her brain due to her complaints of generalized weakness (Tr. at 257-258, 269-270). The impression is listed as "mild periventricular white matter changes - otherwise normal brain MRI". She also had x-rays of her chest in search of a foreign body due to previous gallbladder surgery (Tr. at 259-260). No foreign body was seen, the visualized bones were normal, the cardiomediastinal silhouette was normal, and lungs were normal. There is a handwritten note that someone tried to call plaintiff at 5:25 on May 31, 2005, but there was no answer.

Plaintiff did not see a medical professional about any of her impairments for the next ten months. The only doctor she saw regarding any impairment during that time was Dr. Israel, a consultative psychologist, to whom plaintiff was referred by the ALJ.

On November 3, 2005, Alan Israel, Ph.D., a psychologist, examined plaintiff in connection with her disability application (Tr. at 288-293). He administered the Wechsler Adult Intelligence Scale-III, the Wechsler Memory Scale-III, the Trail-Making Test, the Minnesota Multiphasic Personality Inventory-2, and a basic individual psychological consultation. Portions of his report are as follows:

The claimant states that she has worked on and off as a dishwasher at a café for about 5 years. She was uncertain of the dates. Prior to that she worked at Wal-Mart. She states her most recent regular job was at Food-4-Less, which she left in 2003 after 3 or 4 years. She was a cashier and floral designer. She claims she left because of a heart attack, although the record does not indicate that she had a heart attack.

. .. She indicates that she has both good and bad days. She states on a good day she will get up at 9:00, sit around, dust, make the bed, do a load of washing, rest, and then help fix dinner. She states on a bad day she will have weak feelings all over and will stay in bed almost the entire day. . . . She is very vague about other details relating to her activities. . . .

The claimant's husband was also interviewed. . . . He indicates that she can follow directions and can cook if she is not feeling dizzy. She states that he cleans the house but she does the laundry and folds the clothes. He states together they take periodic walks. He states she now refuses to go to church because she feels that she cannot sit still.

. . . Her speech was quiet but goal-directed. Her flow of thought shows no blocking, circumstantial or tangential thought processes, preservation, flight of ideas, loose association, or indecisiveness. Although she claims that she is depressed and she was periodically tearful, in general her mood did not reflect significant anxiety or depression. Her affect was animated. Her interview behavior was cooperative. . . .

. . . On the Wechsler Adult Intelligence Scale-III, the claimant had a Verbal IQ score of 79, Performance IQ score of 74, a Full Scale IQ score of 75, a Verbal Comprehension Index score of 78, and a Perceptual Organizational Index Score of 70. . . . Her weaknesses fell in the area of general information and attention to detail. . . . The test results do appear to be an accurate reflection of her present level of intellectual functioning. The test results suggest that she functions in the Borderline area of intelligence. On the Wechsler Memory Scale [she] . . . fell into the low average range. . . . Her scores are within the expected level, given her level of intellectual functioning.

The Minnesota Multiphasic Personality Inventory was
administered. Prior to taking this exam the claimant was
asked to read several questions and had no difficulty
reading or comprehending these questions. Several times
during the exam the examiner checked her work to make sure
she was focusing and marking the right boxes in her
responses. There were no difficulties in test taking
behaviors. The Validity scales of the Wechsler Adult
Intelligence Scale suggest an invalid profile. Her response
pattern on the Validity scales indicate that she claims to
have an excessive number of serious psychopathology
symptoms. People who have this pattern with no history of
hospitalizations or psychosis are considered to be "fake
bad". This is especially true because she identifies a very
small number of normal characteristics. Because of the
Validity pattern the MMPI is not valid.

This claimant has a history of vague complaints with various
physiological and psychological symptoms. Based on the
tests administered and her behavior during the exam the
following are suggested:

Axis I
--Depressive Disorder NOS
--Anxiety Disorder NOS
--Somatoform Disorder[6] NOS

Axis II
--Borderline Intellectual Functioning

The claimant's most disabling symptom at the present time
appears to be her Somatoform Disorder. Her depression,
anxiety, and level of intellectual functioning would not
interfere with her ability to work on a simple job.
However, she continues to see herself as being in pain and
continues to report symptoms which the husband indicates she
actually experiences and which have no physiological basis.
Because of these symptoms she would have a difficult time
with concentration and adapting to a work-related

---

[6]People with somatoform disorder have a number of different
symptoms that typically last for several years. Their symptoms
can't be traced to a specific physical cause. In people with
somatoform disorder, medical test results are either normal or do
not explain the person's symptoms. People who have somatoform
disorder often become very worried about their health because
they do not know what is causing their health problems.

Case 5:06-cv-06142-REL   Document 11   Filed 08/31/07   Page 23 of 50

environment, although she does not have difficulty understanding and remembering simple instructions or interacting socially.

That same day, Dr. Israel completed a medical source statement mental (Tr. at 285-287). He found that she had a slight impairment in her ability to understand and remember short, simple instructions and her ability to carry out short, simple instructions. He found that she had a moderate limitation in her ability to interact appropriately with the public, interact appropriately with supervisors, interact appropriately with co-workers, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting. He found that she was slightly more than moderately limited and slightly less than markedly limited in her ability to understand and remember detailed instructions, carry out detailed instructions, and make judgments on simple work-related decisions. In support of these findings, Dr. Israel wrote, "Intellectually capable, but borderline, however somatoform disorder and focus on pain and dizziness interferes with processing information. Diagnosis includes Somatoform Disorder and Borderline Intellectual Functioning."

On March 10, 2006, plaintiff saw Kent Huston, M.D., a rheumatologist (Tr. at 295-296). Plaintiff "presented with a long history of musculoskeletal pain. She has had pain in the hips and legs for the past five to six years but it became

24

progressively worse over the past year. . . . She quit working in 2003 partly because of her symptoms, but also because of a second myocardial infarction [heart attack]. . . . She is not on anything currently for her pain." Plaintiff weighed 275 pounds. She had pain with limitation of motion in both hips, mild limitation of flexion in the knees. The remainder of her physical exam was normal. She had x-rays taken of her pelvis which showed normal hips and sacroiliac joints. Standing view x-rays of her knees were normal. The lumbar spine was normal. A test for rheumatoid factor was negative, CRP was normal, complete blood count was normal, and blood chemistries were normal. "It was my impression Mrs. Aborn's widespread pain was due to fibromyalgia." He prescribed Flexeril, a muscle relaxer, and Ultram for pain.

## C. *SUMMARY OF TESTIMONY*

During the September 26, 2005, hearing, plaintiff testified; and Denise Waddell, a vocational expert, testified at the request of the ALJ.

## 1. **Plaintiff's testimony.**

At the time of the hearing, plaintiff was 47 years of age and is currently 49 (Tr. at 30). She went to school through the 8th grade and did not get a GED (Tr. at 30). Plaintiff has a valid driver's license but does not drive much due to lightheadedness and panic attacks (Tr. at 31). Plaintiff began

25

reducing her driving because of these symptoms in November 2003 (Tr. at 31-32). She sometimes drives to the post office which is about four blocks from her house (Tr. at 32). She makes this drive once a month; usually she tries to walk it (Tr. at 32).

Plaintiff has been married for 21 years and has one grown child (Tr. at 32). She has no trouble using her hands (Tr. at 32). She is 5' 7" tall and weighs 270 pounds (Tr. at 32). Plaintiff testified that her normal weight was 165 to 170 when she was working, but that she gained a hundred pounds after she stopped working and stopped smoking, which was about two years ago in 2003 (Tr. at 32-33).

Plaintiff last worked in July 2003 as a florist at Food 4 Less (Tr. at 33). She was there full time for about six months (Tr. at 33). She had to pull up the stock, cut the flowers, dethorn them, make arrangements, set up displays, and deliver to funeral homes or churches (Tr. at 33). She worked with customers and also used the cash register (Tr. at 33). Plaintiff left that job when she had a heart attack, which was her second one (Tr. at 34). Her first heart attack was in 1998 (Tr. at 34). Plaintiff was not treated regularly by a doctor from 1998 to 2003 because the doctor said he could not find anything wrong (Tr. at 34).

Plaintiff had her gallbladder out earlier in the month before her second heart attack (Tr. at 58). The ambulance crew and hospital staff all said it was a heart attack, abut her

26

doctor never would absolutely say it was a heart attack (Tr. at 58). It was then that her anxiety problem got worse (Tr. at 58).

Plaintiff worked at Trudy's for about a year part-time because there were no full time jobs there (Tr. at 35). She worked 25 hours per week making $3.00 per hour (Tr. at 35). She left that job because she was having trouble lifting the bus tubs (Tr. at 35). She went from that job to the job at Food 4 Less (Tr. at 36). She worked at TJ's off and on for six or seven years (Tr. at 34). Plaintiff's earnings were low from 1999 until she stopped working because she did not have the strength to work 40 or 50 hours a week anymore after her first heart attack (Tr. at 36). Plaintiff's last good-paying job was at Wal-Mart but she was demoted from customer service manager to cashier because of her attendance (Tr. at 36-37).

When plaintiff had her heart attack in 2003, she was at the kitchen counter on her day off trying to figure out what to have for lunch (Tr. at 37). She kept getting hot and kept turning her air conditioner down (Tr. at 37-38). She got weak and had pain between her shoulder blades (Tr. at 38). Her husband asked if she wanted him to check her blood sugar (he is a diabetic), but she said, "No, call 911" (Tr. at 38). She passed out and came to in the ambulance (Tr. at 38). She was taken to Heartland Hospital where she stayed for four or five days (Tr. at 38).

27

When she was discharged, she was not put on any medication (Tr. at 38).

Plaintiff wore a Holter monitor for 30 days (Tr. at 39). If she had one of those "feelings", she was to activate it (Tr. at 39). She activated the monitor two or three times, but nothing was picked up (Tr. at 39). After that, she had a monitor implanted and she wore it for a year and a half (Tr. at 39). The doctors said it did not show any incidences of rhythms (Tr. at 39). Although plaintiff has continued to have the symptoms, she is not being treated by any doctor because they have told her there is nothing they can do (Tr. at 39). When she has an episode, she feels very weak and it feels like her heart slows down (Tr. at 40). Then it feels like it is beating very fast (Tr. at 40). She gets dizzy and lightheaded and she needs to lie down or be still (Tr. at 40, 42). These episodes can last a day or two and she gets them a couple of times a week (Tr. at 40). Plaintiff's doctor told her to see a mental health specialist because he thought it was all in her head (Tr. at 41). Her doctor also wanted to get an MRI, but plaintiff could not afford it (Tr. at 41).

These episodes happen more away from home because plaintiff feels safer at home (Tr. at 43). But if she has a lot on her mind and she thinks about things a lot, the episodes happen more at home (Tr. at 43).

28

Plaintiff has headaches that are so bad they keep her from doing things (Tr. at 43). She has these about once or twice a month (Tr. at 43-44). If she catches it early and lies down, she can get rid of the headache in a day (Tr. at 44). Otherwise it lasts two or three days (Tr. at 44). She takes over-the-counter Advil for her headaches (Tr. at 44). Recently plaintiff had a scan of her brain because of headaches, and she was told she has some kind of white mass (Tr. at 41-42). It means that somewhere down the line she will have dementia, but she feels like she already has it (Tr. at 42).

Plaintiff had surgery on her left knee in the early 1990's (Tr. at 44). She has had problems with it giving out ever since then (Tr. at 44). It gives out when she is trying to get out of a chair or trying to get something from the bottom of a cabinet (Tr. at 44). Sometimes if she walks too much it will give out (Tr. at 44). Plaintiff also has problems with her right shoulder (Tr. at 44-45). It bothers her if she tries to lift or carry more than she should (Tr. at 45). Plaintiff is unable to reach above her head (Tr. at 45). If she needs to reach above her head, she has to do it with her left hand (Tr. at 45). She has no problem writing with her right hand (Tr. at 45).

Plaintiff suffers from pain in her back and hips (Tr. at 45). She has seen a chiropractor for that, but he told her that he cannot keep her in place (Tr. at 46). She saw him for a year

Case 5:06-cv-06142-REL   Document 11   Filed 08/31/07   Page 29 of 50

but then he said he could not do anymore for her because her disc was too bad (Tr. at 46). Her back was injured in a car accident in the 1970's (Tr. at 46). Plaintiff has not seen a medical doctor about her back (Tr. at 46, 55).

Dr. Vega put plaintiff on Prozac the beginning of September 2005 (Tr. at 47, 57). Plaintiff thinks it has helped because she does not have her little outbursts (Tr. at 47). This is when she gets angry (Tr. at 47). For example, she was in Wal-Mart and the checker rang something up wrong and argued with plaintiff, and she got the sign off the shelf to show that she was right (Tr. at 47). Before, plaintiff would never have made a scene (Tr. at 48). The Prozac has calmed her down some (Tr. at 48). Plaintiff has been taking Effexor for four or five months (Tr. at 49, 57). She is not sure why she has not sought mental health treatment, she thinks her doctor wants to see how this medication works (Tr. at 57).

Plaintiff can lift and carry about five or six pounds (Tr. at 49). If she lifts more, her back hurts (Tr. at 49). Plaintiff can walk for three blocks before her back starts "really hurting" (Tr. at 49). Plaintiff can stand ten to 15 minutes at a time (Tr. at 49). Then she has to walk around or her back will hurt (Tr. at 49). Plaintiff's hips hurt if she sits too long (Tr. at 49). She can only sit for 20 to 25 minutes (Tr. at 50).

30

Plaintiff normally gets up at 9:00 a.m. and usually makes the bed (Tr. at 50). She sleeps in sweats and a t-shirt and usually just stays in that during that day (Tr. at 50). Sometimes she skips bathing, coming her hair, and brushing her teeth because she does not feel like it (Tr. at 50-51). Her husband says she is lazy (Tr. at 51). Plaintiff does her normal housecleaning, but she is not able to vacuum because it hurts her arm and chest (Tr. at 51). She does not allow the house to get dirty, she and her husband pick up after themselves (Tr. at 51). Plaintiff cleans the toilet, does the laundry, and cooks (Tr. at 51). Her husband helps her cook because sometimes she forgets she's cooking and falls asleep, leaving food to burn on the stove (Tr. at 52).

Plaintiff spends all day alternating between lying down and lying in her recliner, then she takes a hot shower to help her back, and gets back in the recliner (Tr. at 52). She sits in the recliner because it can go flat and she does not want to have to remake the bed (Tr. at 52). Plaintiff sleeps about four or five hours a night because of back and hip pain (Tr. at 53). She will get up and go through her desk or take a hot shower to help ease the pain (Tr. at 53). In the evenings plaintiff watches television or tries to go for a walk (Tr. at 53). She normally sleeps better if she can walk some in the evening (Tr. at 53).

31

The main reason why plaintiff cannot work is the weakness in her back (Tr. at 53). That scares her and then she has panic attacks (Tr. at 53). She also is afraid to have someone rely on her because she is forgetful (Tr. at 54). When asked about attendance, plaintiff considered that her biggest problem (Tr. at 54). She does not think anyone would let her work if she only showed up two or three days a week (Tr. at 54-55).

Plaintiff was able to work with her back and shoulder pain by taking Advil (Tr. at 56). Plaintiff had to grin and bear it because she had to go to work (Tr. at 56). Plaintiff's husband does not work, he is on disability for seizures (Tr. at 56).

## 2.  **Vocational expert testimony.**

Vocational expert Denise Waddell testified at the request of the Administrative Law Judge. The first hypothetical included a person who could lift and carry 20 pounds occasionally and ten pounds frequently; stand, walk, or sit for 30 minutes at a time, would need a sit/stand option through the day; could not use ladders or scaffolds; could not work at unprotected heights, perform overhead work, drive, or work around dangerous machinery; can only occasionally stoop, kneel, crouch or crawl; and would have a moderate limitation in several mental abilities[7] (Tr. at 59-60). The vocational expert testified that such a person could

---

[7]The ALJ said the following: "and referring to the Mental Residual Functional Capacity Assessment form, would be moderately limited as to paragraphs three, four, 12, and 14."

not perform any of plaintiff's past relevant work, but the person
could be a small products assembler, with 18,900 in Missouri and
659,000 in the nation; a mail sorter, with 3,500 in Missouri and
146,000 in the nation; or a machine tender, with 10,800 in
Missouri and 223,000 in the nation (Tr. at 60).

The second hypothetical involved a person who could lift and
carry five pounds occasionally and negligible weight frequently;
could stand and walk for 15 minutes at a time and for a total of
two hours per day; could sit for 30 minutes at a time and for a
total of six hours per day; could not use ladders or scaffolds,
work at unprotected heights, perform overhead work, drive, work
with or around dangerous machinery; could occasionally stoop,
kneel, crouch, or crawl; and would be moderately limited "as to
paragraphs three, five, seven, nine, 11, 14, and 15."  The
vocational expert testified that such a person could perform no
work (Tr. at 61).

The third hypothetical involved a person who can lift no
more than five pounds, has the other physical restrictions in the
second hypothetical, and she would have a marked limitation in
her ability to perform work routinely during an average day (Tr.
at 62).  The vocational expert testified that because of the
marked limitation in her ability to perform work routinely during
the day, such a person could not work (Tr. at 62-63).

33

*V.    FINDINGS OF THE ALJ*

On January 27, 2006, the ALJ entered his opinion finding plaintiff not disabled (Tr. at 18-25).

Step one.  The ALJ found that plaintiff had engaged in substantial gainful activity through 2000, so she was not disabled through the end of 2000 pursuant to step one of the sequential analysis (Tr. at 19).  The ALJ continued through the remaining steps as of January 1, 2001 (Tr. at 19).  Plaintiff earned $2,659.76 in 2001; $1,852.00 in 2002; and $4,378.28 in 2003 (Tr. at 19).  Those earnings do not amount to substantial gainful activity; however, the ALJ noted that it is evidence of her ability to work when she alleges she was disabled (Tr. at 19).

Step two.  The ALJ found that plaintiff suffers from the following severe impairments: status post left knee surgery and right shoulder surgery in the remote past; lumbosacral pain; anxiety; depression; somatoform disorder; borderline intellectual functioning; and near syncope of unknown etiology (Tr. at 19).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 19).

Step four.  Plaintiff's mental impairment includes mild limitation in activities of daily living; moderate difficulties maintaining social functioning; moderate difficulties maintaining concentration, persistence, or pace; and no periods of

34

decompensation of extended duration (Tr. at 19). She retains the residual functional capacity to lift and carry 20 pounds occasionally and ten pounds frequently; walk or stand 30 minutes at a time and for four hours per day; sit for 30 minutes at a time and for four hours per day; occasionally stoop, kneel, crouch, and crawl; and is moderately limited in her ability to understand, remember, and carry out detailed instructions; moderately limited in her ability to interact appropriately with the public; and moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors (Tr. at 23).

With this residual functional capacity, plaintiff is unable to return to her past relevant work (Tr. at 23).

Step five. With this residual functional capacity, plaintiff can work as a small products assembler, a machine tender, or a mail sorter, all of which are available in significant numbers in the national and regional economies (Tr. at 24).

Therefore, plaintiff was found not disabled at the fifth step of the sequential analysis.

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's

36

daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> The medical evidence shows that although claimant alleges she has gained weight from 170 to 270 over the past 2-3 years, her weight was 229 pounds on November 5, 1999, 240 pounds on April 30, 2001, 209 pounds on September 26, 2003, 212 pounds on November 18, 2003, 227 pounds on January 29, 2004 and 265 pounds on May 12, 2005. Thus, since 1999, claimant's weight has never been below 209 pounds and her allegation of significant weight gain of 100 pounds is less than credible. Her weight has fluctuated and she has gained about 50 pounds since she alleges she became disabled.

> The undersigned notes that claimant alleges one of her main reasons for not working is because of back pain, yet she has not sought medical treatment for back pain in five years, despite going to doctors for many other symptoms. Claimant testified she has problems raising her right arm overhead but again, she has not sought treatment for shoulder problems and was able to work for many years after having rotator cuff surgery. An x-ray of her right shoulder on July 20, 2000, was reported as "stable" with no evidence of acute fracture, subluxation, or significant degenerative change. Claimant was seen for right hip pain on May 23, 2002, and an x-ray that day showed "a little bit of mild OA".

> Claimant saw her treating physician, Susan Vega, M.D., on July 27, 2003, which is when claimant alleges she had a "heart attack". Dr. Vega diagnosed syncope or near syncope with some palpitations without any current evidence of abnormalities. Claimant was also noted to have "quite stable" degenerative joint disease. As noted at the hearing, a 24-hour Holter monitor showed no abnormalities

37

nor did a heart implant which she wore for one-and-a-half years.  The undersigned notes the medical evidence shows claimant has not had a heart attack, despite her testimony to the contrary.

Claimant was referred to S. R. Davuluri, M.D., a neurologist, on September 26, 2003 and complained of dizziness, near syncopal events, headaches twice a week, and was wearing a King of Hearts heart monitor.  Dr. Davuluri reported, "Ms. Aborn presented with a history of near syncopal events and her examination reveals no abnormality. She possibly may have postural hypotension" but the undersigned notes this diagnos[is] was never established. . . .

The undersigned notes that claimant has filed for disability benefits in the past in July 1996, March 1997, and May 2000 but has consistently been found not disabled.  The medical evidence includes a treatment note by a nurse practitioner dated March 27, 1997 when claimant was seen for complaints of dizziness and migraines.  It stated, I told her that per my conversation with Dr. Makos, she did not see any reason why she (claimant) could not work and I am not inclined to disable anybody because of headaches. . . " Further, a CT scan of her head on December 28, 2003 was normal and an MRI of her head of May 24, 2005 showed "very mild periventricular white matter changes" but was "otherwise normal".

Finally, claimant attended a psychological consultative exam with Alan R. Israel, Ph.D., on November 3, 2005 and stated her symptoms prevented her from doing housework or yard work and she was usually unable to get up for more than an hour or two during [the] day.  She described having pain, especially in her legs and hips, and stated her heart "speeds up and slows down".  Claimant was administered a number of tests including the MMPI which was considered invalid because "People who have this pattern with no history of hospitalizations or psychosis are considered to be 'fake bad'".  Based on his examination and testing, Dr. Israel diagnosed depressive disorder NOS, anxiety disorder NOS, and somatoform disorder NOS with borderline intellectual functioning.  Dr. Israel reported, the claimant's most disabling symptom at the present time appears to be her Somatoform Disorder.  Her depression, anxiety, and level of intellectual functioning would not interfere with her ability to work on a simple job.  However she continues to see herself as being in pain and continues

to report symptoms which the husband indicates she actually experiences and which have no physiological basis. Because of these symptoms she would have a difficult time with concentration and adapting to work-related environment, although she does not have difficulty understanding and remembering simple instructions or interacting socially".

. . . Claimant's allegations, including subjective complaints of pain, are not fully credible in light of her lack of medical treatment, particularly for back pain, discrepancies between claimant's assertions and information contained in the documentary reports, particularly regarding her allegation of a history of two heart attacks, the reports of treating and examination practitioners, the need for only mild or over-the-counter medication to control her symptoms, and her ability to work when she alleges she was disabled.

(Tr. at 21-22).

## 1. PRIOR WORK RECORD

Plaintiff's prior work record establishes that she has had very meager earnings during her entire life. In fact, plaintiff's most profitable earnings years occurred <u>after</u> her alleged onset date. Plaintiff alleges that she became disabled on January 20, 1999; however, she earned $8,629.27 in 2000, the highest annual earnings of her entire life. Plaintiff's earnings record creates doubt that plaintiff's not working now is because of something other than her impairments.

## 2. DAILY ACTIVITIES

In a September 7, 2003, administrative form, plaintiff indicated that she is unable to do the laundry or make her bed; however, she testified at the hearing that she does indeed make

39

her bed and do the laundry. In addition, plaintiff's husband told Dr. Israel that plaintiff does the laundry.

On July 2, 2001, plaintiff told Debra Pankau that she had been working 11-hour days. On July 27, 2003, plaintiff told an emergency room physician that she had no difficulty with activities of daily living. On July 28, 2003, plaintiff indicated that she had been doing some work on Saturday and some work on Sunday, which contradicts her testimony that she spends most of her days in bed.

On May 12, 2005, plaintiff told Debra Pankau that she was on her feet a lot.

Plaintiff testified that she does normal housecleaning and that she picks up after herself and does not let her house get dirty. She cleans the toilet, does laundry, and helps her husband cook.

In addition, there are multiple notations in the record[8] where doctors attempted to call plaintiff at her home and there was no answer, leaving the impression that plaintiff goes out of her home more often than she alleges.

Plaintiff's daily activities are not consistent with either her testimony or with total disability.

---

[8]January 31, 2001; February 1, 2005; May 31, 2005.

*3. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS*

The medical records establish that plaintiff's symptoms did not occur very often and were not intense.

On May 23, 2002, plaintiff told Debra Pankau that other than increased hip pain, she had no other pain problems. On July 15, 2003, she complained of gallbladder pain but reported that she had otherwise been in good health. On July 28, 2003, plaintiff reported to Dr. Lammoglia that she had been doing quite well. On February 5, 2005, plaintiff denied dizziness. On April 5, 2005, she had no muscle symptoms and reported that she did not feel depressed.

Plaintiff's husband told Dr. Israel on November 3, 2005, that plaintiff can follow directions. Dr. Israel observed that plaintiff's mood did not reflect significant anxiety or depression. Plaintiff had no difficulty reading or comprehending questions, and had no difficulties in test taking behaviors.

Plaintiff told Dr. Huston on March 10, 2006, that she had had pain in her hips and legs for the past five to six years but it became progressively worse over the last year. The records show that plaintiff complained back in October 2001 that she twisted her hip. The nurse practitioner noted it was really pain in the gluteus maximus and not in the hip joint. She told plaintiff to get an x-ray; however, plaintiff failed to do that. Seven months later, in May 2002, plaintiff went back to the nurse

41

practitioner and complained again of burning in her hip. She had
the x-ray, which was normal. The nurse said plaintiff may have a
little mild osteoarthritis. Plaintiff did not complain of hip
pain again until March of 2006 when she told Dr. Huston she had
suffered hip pain for five or six years. At that time, her hip
x-rays were normal again. I also note that although plaintiff
told Dr. Huston her hip pain had gotten worse over the past year,
she did not mention hip pain to any other doctor during that past
year.

Plaintiff testified that she has had problems with her left
knee giving out since the early 1990's; however, plaintiff never
told any doctor that her knee "gives out". In addition,
plaintiff was able to work for well over a decade after that knee
surgery and with her knee allegedly giving out.

Plaintiff alleged that the main reason she cannot work is
her back; however, she admitted she has never seen a medical
doctor about her back. She testified that she takes hot showers
to relieve her back pain, and she testified that she was able to
work with her back and shoulder pain by taking over-the-counter
Advil, indicating that her pain is not disabling.

Plaintiff admitted that she had not sought mental health
treatment and did not know why.

The overwhelming evidence establishes that plaintiff's
symptoms are not so bad or frequent that she requires anything

42

other than sporadic medical care and over-the-counter pain relievers.

**4.   *PRECIPITATING AND AGGRAVATING FACTORS***

Plaintiff told Debra Pankau that "some smells make her dizzy".  There is very little evidence of other precipitating or aggravating factors.

**5.   *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION***

The record establishes that plaintiff has been given over-the-counter or very mild prescription medication, and that she has not experienced adverse effects from any medication.

In May 2002, plaintiff told Debra Pankau that she would take an occasional Motrin.  This was in regard to her hip pain.  She was prescribed a non-steroidal anti-inflammatory.  The only narcotic pain medicine plaintiff took was Lortab, which she was prescribed after her gallbladder surgery, and she was given it once in the hospital for a headache.

On February 5, 2005, when plaintiff went to the emergency room for her sinuses, she was on no medication.  On March 10, 2006, when plaintiff saw Dr. Huston, a rheumatologist, she was not on any medication for pain.  Dr. Huston prescribed a muscle relaxer.

Plaintiff testified that she takes over-the-counter Advil for her headaches.  She also testified that she was able to work

43

with her back pain and shoulder pain by taking over-the-counter Advil.

Plaintiff noted in her administrative forms that she does not have any side effects from any medication.

## 6. *FUNCTIONAL RESTRICTIONS*

Plaintiff stated in her administrative forms that she had not driven in several months, but that no one had advised her not to drive.

There are very few limitations in plaintiff's medical records. She was advised not to bear weight on her ankle for three days and to stay off work as a waitress for four days in February 2000 after she sprained her ankle. On December 28, 2003, plaintiff was told by an emergency room doctor to avoid driving "until well" after she complained of dizziness but all of her tests were normal.

Instead of restricting plaintiff's activities, her doctors encouraged her to be more active. On November 5, 1999, plaintiff was encouraged to exercise. On October 27, 2000, plaintiff was encouraged to perform aerobic exercise 20 minutes three times per week. On July 2, 2001, plaintiff was told she needs to exercise more and was told to walk at least three times a week.

This factor supports the ALJ's credibility determination.

**B.    CREDIBILITY CONCLUSION**

In addition to the above Polaski factors, I note other inconsistencies in the record which support the ALJ's finding that plaintiff is not entirely credible.

Plaintiff alleges she became disabled on January 20, 1999, but there are no medical records for nearly a year prior to that date and no medical records for nearly a year after her alleged onset date. There is a seven-month period from October 2001 until May 2002 when plaintiff did not see a medical professional for any of her disability-related impairments. A 14-month period elapsed from May 23, 2002, until July 14, 2003, when plaintiff was not seen for any disability-related impairments.

On June 6, 2000, plaintiff reported she was feeling fine and had no problems other than her desire to lose weight. In July 2003, plaintiff told her doctor that she is a housewife.

Although plaintiff complained of hip pain in October 2001, she waited seven months to get the x-ray she was told to get the next day.

When plaintiff went to the emergency room on July 14, 2003, she reported she does not smoke, but the following day she told her gallbladder surgeon that she smokes a pack of cigarettes daily. Plaintiff told Dr. Israel that she worked at Food 4 Less for three or four years, but she testified at the hearing that she worked there for six months. Plaintiff testified that she

45

can only walk for three blocks, yet she also testified that she walks to the post office which is four blocks away (an eight-block round trip). Plaintiff testified that she has panic attacks, but she was never assessed with a panic attack. As the ALJ pointed out, plaintiff testified that she gained 100 pounds in the last two years, or since 2003; yet, her weight was recorded as follows in her medical records:

| | |
|---|---|
| November 5, 1999 | 229.0 pounds |
| May 4, 2000 | 233.0 pounds |
| October 27, 2000 | 231.5 pounds |
| April 30, 2001 | 240.5 pounds |
| July 2, 2001 | 228.0 pounds |
| October 18, 2001 | 213.5 pounds |
| September 4, 2003 | 206.0 pounds |
| September 26, 2003 | 209.0 pounds |
| October 24, 2003 | 212.5 pounds |
| November 18, 2003 | 212.0 pounds |
| January 6, 2004 | 227.0 pounds |
| January 29, 2004 | 227.0 pounds |
| February 8, 2005 | 250.0 pounds |
| April 5, 2005 | 248.0 pounds |
| May 12, 2005 | 265.0 pounds |

Plaintiff testified on September 26, 2005, that she had gained 100 pounds over the last two years; however, the medical records establish that during those two years, plaintiff's lowest weight was 206 pounds, indicating that she had gained about 60 pounds. Plaintiff's medical records do not indicate that she ever weighed below 206 pounds (nowhere near the 165 to 170 pounds of her testimony) during the seven years covered by her medical records.

46

In addition, almost all of plaintiff's medical tests over the years were normal.  In July 2000, x-rays of her right shoulder were normal.  In May 2002, x-rays of her hip were normal.  In July 2003, after extensive cardiac testing, plaintiff's cardiovascular physician noted that plaintiff was without any evidence of abnormalities.  In September 2003, plaintiff's cardiac exam was normal.  The cardiovascular physician noted that all of plaintiff's emergency room visits had "panned out to be normal".  In September 2003, plaintiff's gait and station were normal, she was oriented times three, and her examination by Dr. Lammoglia revealed no abnormality.  In October 2003, plaintiff's glucose was normal and her A1C was normal.  In November 2003 plaintiff's cardiac exam was normal.  In December 2003 a CT scan of her head was normal.  In November 2004, plaintiff's chest x-rays were normal, and her cardiac exam was normal.  After wearing a Holter monitor and an implanted monitor, the latter for a year and a half, the cardiovascular physician noted no evidence of cardiac weakness or palpitations.  Her cardiac exam was again normal.  In May 2005, plaintiff had an MRI of her brain which showed mild periventricular white matter changes (and an otherwise normal brain MRI), not a "white mass" as alleged by plaintiff.  In May 2005, plaintiff's chest x-rays showed that the visualized bones were normal, hear heart was normal, her lungs were normal.  In November 2005 Dr. Israel

47

observed that plaintiff's mood did not reflect significant anxiety or depression.  In March 2006, plaintiff's pelvic x-rays showed normal hips and sacroiliac joints, and standing view x-rays of her knees were normal.  Her lumbar spine was normal, a test for rheumatoid factor was negative, CRP was normal, CBC was normal, and blood chemistries were normal.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's allegations of disability are not entirely credible.

## VII. HYPOTHETICAL

Plaintiff next argues that the hypothetical relied on by the ALJ did not incorporate all of plaintiff's impairments. Specifically, plaintiff argues that the ALJ should have found plaintiff's testimony credible and included her alleged limitations, he should have considered the findings of Dr. Israel, and he should have considered the diagnosis of fibromyalgia that was made by Dr. Huston after the hearing.

A hypothetical question posed to a vocational expert need only include those impairments and limitations found credible by the ALJ.  Duke v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). In this case, the ALJ properly found plaintiff's alleged limitations not credible; therefore, those limitations were properly omitted from the hypothetical relied on by the ALJ.  Although plaintiff

48

was diagnosed after the administrative hearing with fibromyalgia, defendant properly points out that the diagnosis is not supported by a finding of any tender points, much less the required 11. Therefore, that additional evidence would not change the finding of the ALJ. Finally, the ALJ found that mild limitation in activities of daily living (although as discussed above the record really would support a finding of no limitation in her activities of daily living); and he found moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace. This is consistent with the findings of Dr. Israel, whose report was prepared after the vocational expert testified but whose report is consistent with the findings of the ALJ and the hypothetical question relied upon by the ALJ.

In addition, I note the following: In plaintiff's administrative forms in connection with her disability application, she alleged that she cannot work due to arthritis and heart problems, not due to any mental impairment. She noted that she could watch a two-hour movie as long as she could get up periodically. She told Debra Pankau that she may be depressed "because she thought her husband may be having an affair." There is no evidence that plaintiff was treated for a disabling mental impairment during the relevant time period, and there is no evidence that she had a mental impairment which would combine

Case 5:06-cv-06142-REL   Document 11   Filed 08/31/07   Page 49 of 50

with her other impairments to limit her abilities any further than that found by the ALJ.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
August 31, 2007